## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDDIE M. THOMPSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      CIVIL ACTION NO. 3:2005-375 |
| | ) |
| DETECTIVE LAWRENCE WAGNER, | ) |
| individually and acting in the official | ) |
| capacity of the City of Johnstown as a | ) |
| Police Department Detective, | ) |
| DETECTIVE JAMES KOPERA, | ) |
| individually and acting in the official | ) |
| capacity of the City of Johnstown as a | ) |
| Police Department Detective, and CITY | )      JUDGE GIBSON |
| OF JOHNSTOWN POLICE | ) |
| DEPARTMENT, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER OF COURT

**GIBSON, J.**

### I. SYNOPSIS

This matter comes before the Court on the Motion for Summary Judgment (Document No. 30)

filed by the Defendants. For the reasons that follow, this motion will be granted in part and denied in

part.

### II. BACKGROUND

On September 25, 2003, Bruce Lester ("Lester") was assaulted by a black male. Document Nos.

32 & 34-3, ¶ 1. The black male was brandishing a shotgun, which discharged during the altercation.

1

*Id.* Defendants Lawrence Wagner ("Wagner") and James Kopera ("Kopera"), both of whom were police detectives employed by the City of Johnstown ("Johnstown"), were dispatched to the 300 block of Gray Avenue in Johnstown, Pennsylvania, which was the scene of the incident. *Id.*, ¶ 2. They stopped a vehicle which they believed to contain the suspect who had assaulted Lester. *Id.*, ¶ 3. Wagner and Kopera later interviewed three of the four passengers who had been riding in the vehicle. *Id.*, ¶ 4. These individuals were not arrested.

After conducting a follow-up investigation, Wagner and Kopera completed an affidavit of probable cause, alleging that Plaintiff Eddie M. Thompson ("Thompson") had committed the crimes of attempted aggravated assault, aggravated assault, simple assault and recklessly endangering another person. *Id.*, ¶ 7. Document No. 1, pp. 13-15. A warrant was issued for Thompson's arrest. Thompson was arrested by members of the Pennsylvania State Police ("PSP") on September 30, 2003. Document Nos. 32 & 34-3, ¶ 8.

Thompson's preliminary hearing was held on October 16, 2003. With the approval of the Commonwealth of Pennsylvania, the charges against Thompson were dropped. Document No. 32, ¶ 9. Thompson commenced this action against Wagner, Kopera and Johnstown on September 22, 2005, alleging that representations made by Wagner and Kopera in their affidavit of probable cause, which resulted in Thompson's arrest, had constituted violations of both the United States Constitution and the law of Pennsylvania. Document No. 1; Compl. On October 31, 2007, after the completion of discovery, the Defendants filed a Motion for Summary Judgment. Document No. 30; Mot. for Summary Judgment. That motion is the subject of this memorandum opinion.

2

## III. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate only when it is demonstrated that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32, 106 S.Ct. 2548, 2552-57, 91 L.Ed.2d 265, 273-280 (1986); Fed.R.Civ.P. 56(c). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211-212 (1986). In deciding a motion for summary judgment, all reasonable inferences must be drawn in favor of the non-movant. *Oritani [Sav. And Loan Ass'n v. Fidelity and Deposit Co.*, 989 F.2d 635, 638 (3d Cir. 1993)].

*Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-126 (3d Cir. 1994).

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).

## IV. JURISDICTION AND VENUE

Jurisdiction in this case is predicated on 28 U.S.C. §§ 1331 and 1367(a). Venue is proper under

28 U.S.C. § 1391(b).

3

## V. DISCUSSION

Thompson is vague with respect to the precise legal bases for his claims.[1] Nevertheless, his

federal constitutional claims are actionable only pursuant to 42 U.S.C. § 1983. *Smith v. School District*

*of Philadelphia*, 112 F.Supp.2d 417, 430 (E.D.Pa. 2000). That statutory provision provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage,
> of any State or Territory or the District of Columbia, subjects, or causes to be subjected,
> any citizen of the United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the Constitution and
> laws, shall be liable to the party injured in an action at law, suit in equity, or other
> proper proceeding for redress, except that in any action brought against a judicial officer
> for an act or omission taken in such officer's judicial capacity, injunctive relief shall not
> be granted unless a declaratory decree was violated or declaratory relief was
> unavailable. For purposes of this section, any Act of Congress applicable exclusively
> to the District of Columbia shall be considered to be a statute of the District of
> Columbia.

42 U.S.C. § 1983. Section 1983 does not create substantive rights. *Maher v. Gagne*, 448 U.S. 122, 129,

n. 11(1980). A plaintiff cannot prevail under § 1983 without establishing an underlying violation of

federal law. *Collins v. City of Harker Heights*, 503 U.S. 115, 119 (1992). "Section 1983 itself contains

no state-of-mind requirement independent of that necessary to state a violation of the underlying federal

right." *Board of County Commissioners v. Brown*, 520 U.S. 397, 405 (1997)(internal quotation marks

omitted).

## A. The Fifth and Eighth Amendments

In his Complaint, Thompson makes repeated references to the Fifth, Eighth and Fourteenth

---

[1] Thompson's Complaint includes three counts. Document No. 1, ¶¶ 6-50; Compl., ¶¶ 6-50. All three counts reference the United States Constitution, but only Count III references 42 U.S.C. § 1983. *Id.* To the extent that Thompson asserts claims arising under the Constitution, they are actionable in this context *only* pursuant to § 1983. *Smith v. School District of Philadelphia*, 112 F.Supp.2d 417, 430 (E.D.Pa. 2000).

Amendments. Document No. 1, ¶¶ 40-47; Compl., ¶¶ 40-47. Although he does not specify what provision of the Fifth Amendment he purports to rely on, the Court presumes that he bases his Fifth Amendment claims on the Due Process Clause. The other provisions of the Fifth Amendment, of course, are plainly inapplicable to the facts alleged by Thompson. U.S. Const. amend. V. The Fourteenth Amendment has its own Due Process Clause, which limits the actions of *states*. U.S. Const. amend. XIV, § 1 (". . . nor shall any *State* deprive any person of life, liberty, or property, without due process of law . . .")(emphasis added). The Due Process Clause of the Fifth Amendment limits the actions of only the *Federal* Government. *Huffaker v. Bucks County District Attorney's Office*, 758 F.Supp. 287, 290 (E.D.Pa. 1991). It does not limit the actions of *state* officials such as Wagner and Kopera. *Id.* Thompson asserts no claims based on the conduct of federal actors. Consequently, he has no viable claims under the Due Process Clause of the Fifth Amendment. The Defendants' Motion for Summary Judgment will be granted with respect to any claims based on the Fifth Amendment.

Thompson does not allege that he was subjected to an excessive bail, or that an excessive fine was imposed upon him. Accordingly, the Court assumes that his Eighth Amendment claims are based on the Cruel and Unusual Punishment Clause. U.S. Const. amend. VIII. The Cruel and Unusual Punishment Clause is applicable to state actors by virtue of the Due Process Clause of the Fourteenth Amendment. *United States v. Georgia*, 546 U.S. 151, 157 (2006). Nevertheless, the Cruel and Unusual Punishment Clause applies only after a State has secured a formal adjudication of guilt against an individual. *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244 (1983). It "has no application" where, as here, an individual seeks redress for the circumstances surrounding his or her *pretrial* detention. *Id.* Therefore, Thompson cannot proceed against the Defendants with claims under

5

the Eighth Amendment. Summary judgment will be granted in favor of the Defendants with respect to any claims based on the Eighth Amendment.

## B.    The Fourth Amendment

For reasons unknown to the Court, Thompson's Complaint contains no explicit mention of the Fourth Amendment. Although Thompson expressly relies on the Fourteenth Amendment, the United States Supreme Court has made it clear that substantive due process analysis is inappropriate where the standards governing an alleged constitutional violation are provided under a specific provision of the Bill of Rights. *Albright v. Oliver*, 510 U.S. 266, 268-275 (1994)(plurality opinion). As the Defendants recognize, the claims concerning the legality of Thompson's arrest are governed by the Fourth Amendment. Document No. 31, pp. 4-13; Defs. Br., pp. 4-13. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The provisions of the Fourth Amendment are incorporated within the Due Process Clause of the Fourteenth Amendment and, therefore, are applicable to state actors such as Wagner and Kopera. *United States v. Cochran*, 806 F.Supp. 560, 563, n. 1 (E.D.Pa. 1992). The Court will examine the claims concerning Thompson's arrest in accordance with the requirements of the Fourth Amendment.

As in any case brought pursuant to § 1983, the Court must "identify the exact contours of the underlying right said to have been violated." *County of Sacramento v. Lewis*, 523 U.S. 833, 842, n. 5, (1998). The Court understands Thompson to allege that he was illegally "seized" for purposes of the

6

Fourth Amendment. A Fourth Amendment "seizure" occurs when there is a governmental termination of movement through means intentionally applied. *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989). It is undisputed that Thompson was arrested (i.e., "seized") on September 30, 2003. The Constitution, however, does not proscribe all seizures. The constitutionality of Thompson's arrest depends on whether it was "reasonable" within the meaning of the Fourth Amendment.

"The essential predicate for a § 1983 claim for unlawful arrest is the absence of probable cause." *Forest v. Pawtucket Police Department*, 290 F.Supp.2d 215, 230 (D.R.I. 2003). Thompson argues that the arresting officers lacked the requisite "probable cause" to arrest him. Wagner and Kopera, of course, were not the officers who actually arrested Thompson. Nevertheless, the Supreme Court has explained that § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Monroe v. Pape*, 365 U.S. 167, 187 (1961). Since the common law recognized a "causal link" between the submission of a criminal complaint against an individual and an ensuing arrest of that individual, § 1983 has been construed to recognize that same causal relationship. *Malley v. Briggs*, 475 U.S. 335, 344, n. 7 (1986). For this reason, it is clear that "a government official's liability for *causing* an arrest is the same as for carrying it out," and that "§ 1983 liability for an unlawful arrest can extend beyond the arresting officer to other officials whose intentional actions set the arresting officer in motion." *Berg v. County of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000)(emphasis added). Thompson's Fourth Amendment claims against the Defendants are not precluded merely because Thompson was arrested by officers employed by the PSP rather than by Wagner and Kopera. With that in mind, the Court now turns to the factual circumstances surrounding Thompson's arrest.

7

The evidence of record, viewed in the light most favorable to Thompson, reveals that an anonymous female dialed 911 at 4:16 P.M. on September 25, 2003, to report that a black male was firing a gun on the 300 block of Gray Avenue in Johnstown, Pennsylvania. Document No. 33-4, p. 24. The female refused to identify herself. Document No. 33-3, pp. 62-63. Officer Michael D. Beblar ("Beblar"), a patrolman, responded to the call. *Id.*, p. 67. In a deposition, Wagner testified that he and Kopera had decided to respond to the call as well, given the seriousness of the situation. *Id.*, p. 15; Wagner Dep., pp. 56-57. At some point, Wagner and Kopera were told that Concessor "Skinny" Cheatham had allegedly fired a silver colored handgun at two individuals. Document No. 33-4, p. 24. Shortly thereafter, Wagner and Kopera observed Concessor Cheatham, who they recognized, driving a four-door, maroon colored vehicle on Crouse Avenue in Johnstown, near the Prospect public housing community.[2] *Id.* Maurice Cheatham, the brother of Concessor Cheatham, was riding in the front passenger seat. Document No. 33-3, p. 17; Wagner Dep., p. 64. Nathan Willis ("Willis") was seated in the rear passenger seat, and Shakina Burch ("Burch") was seated immediately behind the driver's seat. *Id.*

Because they recognized Concessor Cheatham, Wagner and Kopera decided to stop the vehicle. *Id.*; Wagner Dep., p. 62. The vehicle stopped when Wagner and Kopera activated the audible and visual signals in their unmarked police car. *Id.*; Wagner Dep., p. 63. The four occupants of the vehicle were

---

[2]The record is somewhat unclear as to who was actually operating the vehicle. In a follow-up report dated February 11, 2004, Wagner stated that Concessor Cheatham's brother, Maurice Cheatham, had been driving the vehicle. Document No. 33-4, p. 24. On February 26, 2007, Wagner testified that Concessor Cheatham had been the driver, and that Maurice Cheatham had been riding in the front passenger seat. Document No. 33-3, p. 17; Wagner Dep., p. 64. The Court need not dwell on this inconsistency, since it is immaterial whether Concessor or Maurice Cheatham was the driver at the relevant point in time.

8

ordered out of the vehicle and placed in handcuffs. *Id.*, p. 18; Wagner Dep., p. 68. A search of the vehicle revealed that no weapons were present. *Id.* Burch was immediately released. *Id.*; Wagner Dep., p. 69. Willis and the Cheatham brothers agreed to go to the Johnstown police station to discuss the situation. *Id.* At the police station, Wagner and Kopera spoke with each of the three individuals separately. *Id.*, p. 19; Wagner Dep., pp. 70-71. All three individuals explained that a black male had appeared on the 300 block of Gray Avenue with a shotgun, screaming about a camcorder. *Id.* According to them, Lester had emerged at the scene and confronted the armed black male. *Id.* Viewing the gun as a threat to his own well-being, Lester apparently grabbed it, inadvertently causing it to discharge. *Id.* The altercation between Lester and the armed individual ended at that point.

Willis and the Cheatham brothers viewed hundreds of photographs at the police station. *Id.*, p. 21; Wagner Dep., p. 78. The array of photographs viewed by the three witnesses included a photograph of Thompson. *Id.*; Wagner Dep., p. 79. Willis and the Cheatham brothers were unable to identify any of the depicted individuals as the black male who had confronted Lester. *Id.* They subsequently left the police station. *Id.*, p. 21; Wagner Dep., p. 80.

Wagner and Kopera decided to return to the area of the disturbance in order to speak with Lester. *Id.*, p. 22; Wagner Dep., p. 85. At this point, the stories told by the parties begin to diverge. Wagner and Kopera both testified that they had encountered Burch while driving back to the area. Document Nos. 33-3, p. 23, 33-4, p. 6; Wagner Dep., p. 86; Kopera Dep., pp. 20-21. Wagner testified as follows:

Q.    So you went back to Prospect to speak with Mr. Lester?

A.    We were heading back to Prospect to speak with Mr. Lester. But on the way there, we saw Shakina Burch and we stopped to speak with her. And at that time, she indicated the same thing, but she specified, and by name, that it was

9

> Eddie Thompson that had the shotgun and was arguing with Mr. Lester. She indicated that Eddie Thompson lives just up the street in the brick house, next to the church parking lot, and that he drives the red Jeep SUV that parks there. So that was the first time we heard the name of Eddie Thompson, as being the suspect. Once we finished speaking with her, then we continued our response, back to see Mr. Lester. As we passed that brick house, we did see a red SUV parked at the back of the house, and then we continued with Mr. Lester.

Document No. 33-3, p. 23; Wagner Dep., p. 86. Kopera also testified that Burch had identified

Thompson as the individual who had confronted Lester with a shotgun. Document No. 33-4, p. 6;

Kopera Dep., p. 21. Thompson denies that Burch had identified him as the perpetrator of the crime

prior to his arrest. Document No. 34-3, ¶ 5.

Wagner and Kopera eventually went to see Lester. In his deposition, Kopera described their

encounter with Lester as follows:

Q. Okay. Based on your conversation with Shakina Burch, what did you do next?

A. We went back to Gray Avenue, in the Prospect Homes, and spoke to–spoke to the–I can't think of his name, it slipped my mind, Bruce Lester, and asked him to come to the police station, which he did, and we brought him down to the police station.

Q. Okay. And what was your purpose in bringing him to the police station?

A. To speak to him about the incident.

Q. Okay. What did he say to you?

A. Well, we wanted to–we had the name of Eddie Thompson, so a line-up, with six pictures, was shown to him and asked if he recognized anybody. And he pointed to Eddie Thompson and stated that was the guy that had the shotgun.

Q. Okay. Do you know whether he knew Eddie Thompson prior to this incident?

A. I believe he may have. And he seemed to know the family, so I would think that

10

he may have known him.

Q. So Bruce Lester, in your opinion, knew Eddie Thompson, prior to this incident?

A. I think he may have, yes.

Q. Okay. Why do you believe he may have?

A. Because he knew the family.

Document No. 33-4, p. 7; Kopera Dep., pp. 22-23. Wagner testified that Lester had identified Thompson as not only the perpetrator of the crime, but also as the brother of Gregory Rantz Thompson. Document No. 33-3, p. 25; Wagner Dep., pp. 96-97. Wagner's testimony is, therefore, consistent with that of Kopera.

Thompson vehemently denies that Lester had identified him as the assailant. He has submitted an affidavit signed by Lester on September 10, 2004. Document No. 34-2, pp. 5-6; Lester Aff. In that affidavit, Lester declared that he had *not* identified Thompson as his assailant on September 25, 2003. *Id.*, p. 6, ¶ 7; Lester Aff., ¶ 7. He stated that he had expressed to Wagner and Kopera his disinclination to press charges in connection with the incident. *Id.*, p. 5, ¶ 6; Lester Aff., ¶ 6. The record indicates that Lester has consistently refused to be deposed for purposes of this case. It appears that he avoided the service of a subpoena to testify on November 2, 2006. Document No. 37-3, pp. 1-2. Although the subpoena was subsequently served by a police officer, Lester failed to appear for his scheduled deposition on December 14, 2006. Document No. 37-4, p. 4; First Lester Dep., p. 4. On March 15, 2007, this Court ordered Lester to appear for a deposition scheduled for March 23, 2007, indicating that his failure to appear could result in a finding of contempt. Document No. 18, pp. 1-2. Nevertheless, Lester again failed to appear for his deposition. Document No. 37-7, p. 4; Second Lester Dep., p. 4.

11

The Defendants filed a Motion in Limine on May 1, 2008, seeking to preclude Lester from testifying at trial. Document No. 37; First Mot. in Limine. On that same day, they also filed a Motion in Limine to preclude the admission of Lester's affidavit into evidence at trial. Document No. 39; Second Mot. in Limine. These motions are currently pending before the Court, but they will not be addressed at this time.[3] The Court notes that the Defendants do not argue that Lester's affidavit should be disregarded for purposes of summary judgment. Document No. 31, p. 10. Therefore, the Court will consider Lester's affidavit as evidence in support of Thompson's case.

In any event, Wagner and Kopera filed a criminal complaint against Thompson, along with an affidavit of probable cause. Document No. 34-2, pp. 2-4; Criminal Compl.; Aff. of Probable Cause. The criminal complaint alleged that Thompson had committed the crimes of attempted aggravated assault,[4] aggravated assault,[5] simple assault[6] and recklessly endangering another person.[7] *Id.*, pp. 2-3; Criminal Compl. The affidavit of probable cause stated:

> On or about 1619 hrs on 25 Sept 03 the Johnstown Police Department was dispatched to a shots fired call at the 300 block of Gray Avenue. Information was given

---

[3]The Defendants have also filed a third Motion in Limine concerning a lease for Thompson's residence in Butler, Pennsylvania. Document No. 40; Third Mot. in Limine.

[4]Under Pennsylvania law, "[a] person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa. Cons. Stat. § 901(a).

[5]Pennsylvania law provides that a person is guilty of "aggravated assault" if he "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa. Cons. Stat. § 2702(a)(1).

[6]Pennsylvania law provides that a person is guilty of "simple assault" if he "attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another." 18 Pa. Cons. Stat.§ 2701(a)(1).

[7]Under Pennsylvania law, "[a] person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa. Cons. Stat. § 2705.

to officers that a Concessor "Skinny" Cheatham had fired a silver colored handgun and fired two rounds at a another individual.

    While investigating this incident, these affiants interviewed Concessor "Skinny" Cheatham, Maurice Cheatham and a W/M/Juv, initials N.W. All three indicated separately that an older black male had brought out a single barrelled shotgun and got into an argument with Bruce Lester. All three indicated that the older black male approached Lester with the shotgun at which time, in self defense, Lester grabbed the shotgun and a struggle ensued causing the weapon to discharge.

    Bruce Lester was interviewed and indicated that the older black male who he later identified from a photo lineup as Eddie Thompson had been into an argument with another individual earlier and he wanted to speak with (Thompson) about that. He indicated that Thompson brought out a single barrelled shotgun and pointed it at him. Lester continued that (Thompson) approached him and then attempted to strike him (Lester) with the shotgun. Lester related that in self defense, he grabbed the shotgun and during the struggle, the weapon discharged. Lester indicated that Thompson then fled the scene on foot with the shotgun.

    During the time of this incident, the weather was sunny and cool and there were many persons from the Prospect Housing Community outside of their residence, walking around the neighborhood. And these persons were thereby placed in danger by Thompson bringing a loaded firearm outside on the street and causing same to be discharged within the city limits of Johnstown.

    Charges filed based on information received through a police investigation which the affiant believes to be true and correct to the best of their knowledge and belief.

*Id.*, p. 4; Aff. of Probable Cause. The portion of the affidavit of probable cause alleging that Lester had

identified Thompson as his assailant directly conflicts with Lester's affidavit. In his affidavit, Lester

declared that all of the individuals depicted in the line-up had looked alike, and that he had never

identified Thompson as the individual who had assaulted him. *Id.*, pp. 5-6, ¶¶ 6-7; Lester Aff., ¶¶ 6-7.

    In any event, a magistrate issued a warrant for Thompson's arrest on the basis of the affidavit

of probable cause. A report completed by Wagner on February 11, 2004, indicated that a woman by

the name of Lisa Krannacker ("Krannacker") had spoken with Wagner at 11:50 A.M. on September 30,

2003. Document No. 33-4, p. 25. The report described the conversation as follows:

13

On 30 Sept 03 at 1150 hrs, this writer spoke by phone with Lisa Krannacker who indicated that she and her husband own rental properties in Butler, PA. Krannacker said that she saw the article in the paper about Eddie Thompson being wanted for a shooting incident. Krannacker said she doesn't believe he could have done the shooting because Eddie Thompson was with her at 1500 hrs on Thursday, 25 Sept 03 looking at an apartment. This writer asked Krannacker if she obtained photo identification from the person who was looking at the apartment and she indicated that she did not. She said that the person who said he was Eddie Thompson was a black male, "fortyish," about 5'7" or taller with a stocky build. Krannacker said that "he was not heavy but he was not thin."

Krannacker said that she saw the photo in the paper which indicated that Eddie Thompson was wanted by police but that, the photo didn't look like the person who was with her looking at an apartment. Krannacker said that the black male who said he was Eddie Thompson got out of a Ford Expedition with a woman who he later told her was "Tracy."

*Id.* In his deposition, Thompson testified that he had been with Krannacker at the time of her telephone conversation with Wagner. Document No. 34-2, pp. 11-12; Thompson Dep., pp. 22-23. He explained that two members of the PSP had arrived to arrest him approximately one hour after Krannacker's telephone conversation with Wagner. *Id.*, p. 14; Thompson Dep., p. 25.

After being arrested in Butler, Thompson was taken to the Westmoreland County Jail. Document No. 33-4, p. 25. He was subsequently transported to the Cambria County Jail. *Id.* He was arraigned on October 2, 2003. *Id.* His preliminary hearing was originally scheduled for October 9, 2003, but it was rescheduled for October 16, 2003. *Id.* Krannacker was present for the preliminary hearing. *Id.*, p. 26. She was prepared to testify that Thompson had been with her in Butler at the time of the incident in Johnstown. *Id.* In their depositions, Wagner, Kopera and Thompson all testified that Lester had refused to testify against Thompson at the preliminary hearing. Document Nos. 33-3, p. 37, 33-4, p. 12, 34-2, p. 16; Wagner Dep., pp. 142-144; Kopera Dep., p. 42; Thompson Dep., p. 27. Wagner testified that Lester had denied that he had ever identified Thompson as his assailant.

14

Document No. 33-3, p. 37; Wagner Dep., pp. 142-144. In his deposition, Thompson testified as follows:

Q.    Let's talk about the preliminary hearing, what happened there?

A.    From what I could see–I was in the holding cell, but I could see what was going on and I could see my mother, you know, from a distance and I could see Bruce Lester out there like talking to my mom and everything. And then I seen the one Detective Kopera, which was the only one that showed up at the preliminary, and him and Bruce Lester got into like a heated argument. I mean I couldn't hear it or nothing, but I could see that he was trying to overpower him or something to an extent, you know.

Q.    Did you talk to Mr. Lester about that conversation?

A.    Yes.

Q.    And what did he tell you happened?

A.    He said that they were trying to force him to say that I was the one that discharged the shotgun.

Q.    Well, how were they trying to do that, what was being done by the police?

A.    I mean my mom said–I didn't see them, but my mom said that the guy had him up in his collar and that, you know, saying that you told us that it was Eddie Thompson, now you're changing your story and he was saying, no, I told you the guy looked like Eddie Thompson, but I know Eddie Thompson and I told you that it wasn't Eddie Thompson, it was the guy that he looked like.

Document No. 34-2, pp. 16-17; Thompson Dep., pp. 27-28. The charges against Thompson were dismissed, apparently at the request of the prosecuting assistant district attorney. *Id.*, p. 17; Thompson Dep., p. 28; Document No. 33-4, p. 27.

The primary factual dispute in this case concerns the question of whether Lester identified Thompson as his assailant, thereby providing Wagner and Kopera with the requisite "probable cause"

15

to seek an arrest warrant. There is a clear conflict in the evidence as to this issue. Lester's affidavit directly contradicts the testimony of Wagner and Kopera. Since Thompson is the nonmoving party, the Court must view the evidence in the light most favorable to him. Hence, the Court proceeds on the assumption that Lester did not identify Thompson as the perpetrator of the crime, and that the portions of the affidavit of probable cause stating that Lester had identified Thompson as his assailant were false.

The issuance of an arrest warrant does not *ipso facto* shield an arresting officer from liability for false arrest. *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000). Regardless of whether the falsehood alleged by the plaintiff is an affirmative misrepresentation or a material omission, a plaintiff such as Thompson must satisfy the two-part test established by the Supreme Court in *Franks v. Delaware*, 438 U.S. 154, 155-156, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), in order to impugn the validity of an arrest warrant. *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997). Under *Franks* and its progeny, Thompson must show that: (1) Wagner and Kopera knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions in their affidavit of probable cause; and (2) the false statements or omissions were material, or necessary, to the finding of probable cause.[8] *Id.* In *Wilson v. Russo*, 212 F.3d 781, 787-789 (3d Cir. 2000), the United States Court of Appeals for the Third Circuit distinguished between "omissions" and "assertions." An omission is made with reckless disregard for the truth where an officer withholds a fact known to him or her that any reasonable person would have known to be a fact which the judicial officer issuing the warrant would have wanted to know for the purpose of determining the existence or absence of probable cause.

---

[8] This standard cannot be met upon a showing of mere negligence on the part of the affiant. *Lippay v. Christos*, 996 F.2d 1490, 1501 (3d Cir. 1993). In his Complaint, Thompson alleges that Wagner and Kopera "knowingly and maliciously made false and misleading statements" about him. Document No. 1, ¶ 17; Compl., ¶ 17.

16

*Wilson*, 212 F.3d at 788; *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993). An assertion is made with reckless disregard for the truth where, in light of all of the relevant evidence, the affiant must have entertained serious doubts as to the truth of his or her statements to the judicial officer. *Wilson*, 212 F.3d at 788; *United States v. Clapp*, 46 F.3d 795, 801, n. 6 (8th Cir. 1995). In order to determine the issue of materiality, a court must "excise the offending inaccuracies" or "insert the facts recklessly omitted." *Wilson*, 212 F.3d at 789. The existence or absence of probable cause depends on whether the "corrected" affidavit would have been sufficient to establish probable cause for the arrest in question. *United States v. Yusuf*, 461 F.3d 374, 383-384 (3d Cir. 2006).

This case concerns an *assertion* rather than an *omission*. Thompson contends that the statements alleging that Lester had identified him as the perpetrator of the crime were deliberate falsehoods.[9] Document No. 34, pp. 1-3; Pl.'s Br., pp. 1-3. Because Lester declared in his affidavit that he had not identified Thompson as his assailant, a reasonable jury could conclude that Wagner and Kopera knowingly and deliberately, or with reckless disregard for the truth, made false statements in their affidavit of probable cause. The materiality of such statements is not subject to serious dispute, since Lester's alleged identification of Thompson was the *only* basis provided by Wagner and Kopera for linking Thompson to the incident in Johnstown. Document No. 34-2, p. 4; Aff. of Probable Cause. With Lester's alleged identification of Thompson excised, the affidavit of probable cause would have linked the incident to an unidentified black male. Needless to say, that would have been insufficient

---

[9]Thompson argues that the Court should consider the exculpatory evidence provided to Wagner by Krannacker in determining whether the arrest was supported by probable cause. Document No. 34, p. 3; Pl.'s Br., p. 3. The problem with this argument is that Krannacker did not speak with Wagner until five days after the arrest warrant had already been issued. Wagner and Kopera cannot be faulted for not disclosing to the magistrate exculpatory evidence which was not available to them at the relevant point in time.

17

to establish the existence of probable cause to believe that Thompson had been Lester's assailant.

Wagner and Kopera argue that they had probable cause to have Thompson arrested because Burch had identified him as Lester's attacker. Document No. 31, pp. 11-13; Defs. Br., pp. 11-13. As noted earlier, both Wagner and Kopera testified that Burch had identified Thompson as the perpetrator of the crime before Lester was interviewed at the Johnstown police station. Document Nos. 33-3, p. 23, 33-4, p. 6; Wagner Dep., p. 86; Kopera Dep., p. 21. In her deposition, Burch testified that she had told Wagner and Kopera that Thompson had been Lester's assailant. Document No. 33-2, p. 9; Burch Dep., p. 9. Thompson has presented no evidence which contradicts this testimony by Wagner, Kopera and Burch. Thus, the Court assumes *arguendo* that Burch did, in fact, tell Wagner and Kopera that Thompson had been the other party to the altercation with Lester.[10]

In their brief, the Defendants contend that the Court can consider Burch's identification of Thompson as Lester's assailant as a part of the probable cause inquiry even though it was not included within the affidavit of probable cause. Document No. 31, pp. 10-13; Defs. Br., pp. 10-13. This argument is unavailing. It is one thing for a court to insert exculpatory evidence that has been wrongfully omitted from an affidavit of probable cause. It is quite another for a court to insert inculpatory evidence that an affiant has neglected to include in his or her affidavit of probable cause. The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. Amend. IV. It does not protect the authority of an officer to make an arrest whenever he or she has

---

[10]Although the Court assumes that Burch told Wagner and Kopera that Thompson had been Lester's assailant, it is worth noting that the affidavit of probable cause did not mention Burch's statements (which allegedly included an identification of Thompson as the perpetrator of the crime) even though it did mention statements made by Willis and the Cheatham brothers (which did not include any identification of Thompson as the guilty party). Document No. 34-2, p. 4; Aff. of Probable Cause.

18

probable cause to believe that a particular individual has committed a crime. The authority of an officer to make such an arrest comes from state law, not from the Constitution. Acceptance of the Defendants' argument would effectively turn the Fourth Amendment upside down. Where an arrest is based solely on the existence of a warrant, evidence available to the affiant but not passed on the issuing authority cannot be used to establish the existence of probable cause. *Butts v. City of Bowling Green*, 374 F.Supp.2d 532, 541-542 (W.D.Ky. 2005). This is confirmed by the Supreme Court's observation in *Whiteley v. Warden, Wyoming State Penitentiary*, 401 U.S. 560, 565, n. 8 (1971), that "an otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate."

Since the deletion of Lester's identification of Thompson as the guilty party would render the affidavit of probable cause insufficient to justify Thompson's arrest, the Court must consider whether the arrest was legal for other reasons. Although the Fourth Amendment permits an officer to make a warrantless arrest in a public place when he or she has probable cause to believe that a particular individual has committed a felony, it does not ordinarily permit an officer to enter an individual's home for the purpose of effecting such a warrantless arrest. *Kirk v. Louisiana*, 536 U.S. 635, 637-638 (2002); *Payton v. New York*, 445 U.S. 573, 590 (1980). While the record is not clear as to this matter, Thompson's deposition testimony suggests that he was arrested in his home. Document No. 34-2, p. 14; Thompson Dep., p. 25. The Court need not dwell on that issue, however, since summary judgment could not be granted in this case even if Thompson had been arrested in a public place.

Thompson was not arrested by Wagner and Kopera. Instead, he was arrested by members of the PSP. There is no evidence suggesting that the arresting officers were aware of Burch's

19

identification of Thompson as Lester's assailant. As far as the Court can tell, the arresting officers were merely executing an arrest warrant that had been procured by Wagner and Kopera. Therefore, the members of the PSP who arrested Thompson were relying solely on the *strength of the warrant. Ott v. State*, 600 A.2d 111, 115 (Md. 1992). If the warrant was invalid (as the Court must assume at this stage, viewing the evidence in the light most favorable to Thompson), the arrest was unconstitutional. An erroneously issued warrant cannot *itself* provide probable cause for an arrest. *Berg*, 219 F.3d at 269-271. This conclusion is confirmed by the following passage from *Whiteley*:

> The State, however, offers one further argument in support of the legality of the arrest and search: the Laramie police relied on the radio bulletin in making the arrest, and not on Sheriff Ogburn's unnamed informant. Clearly, it is said, they had probable cause for believing that the passengers in the car were the men described in the bulletin, and, in acting on the bulletin, they reasonably assumed that whoever authorized the bulletin had probable cause to direct Whiteley's and Daley's arrest. To prevent arresting officers from acting on the assumption that fellow officers who call upon them to make an arrest have probable cause for believing the arrestees are perpetrators of a crime would, it is argued, unduly hamper law enforcement.
> We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.
> In sum, the complaint on which the warrant issued here clearly could not support a finding of probable cause by the issuing magistrate. The arresting officer was not himself possessed of any factual data tending to corroborate the informer's tip that Daley and Whiteley committed the crime. Therefore, petitioner's arrest violated his constitutional rights under the Fourth and Fourteenth Amendments; the evidence secured as an incident thereto should have been excluded from his trial. *Mapp v. Ohio*, 367 U.S. 643 (1961).

*Whiteley*, 401 U.S. at 568-569 (footnote omitted). In *Arizona v. Evans*, 514 U.S. 1, 14 (1995), the

Supreme Court rejected the language in *Whiteley* which had presupposed that the exclusionary rule was

applicable, since later Supreme Court precedents have clarified that the application of the exclusionary rule is a separate issue from the underlying question of whether a Fourth Amendment violation has occurred. *Hudson v. Michigan*, 547 U.S. 586, 592 (2006)("Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression."). Nevertheless, the Supreme Court observed in *Evans* that "*Whiteley* clearly retains relevance in determining whether police officers have violated the Fourth Amendment." *Evans*, 514 U.S. at 13. Where the *only* justification for an arrest is an invalid arrest warrant, the arrest constitutes an "unreasonable seizure" for purposes of the Fourth Amendment. *Berg*, 219 F.3d at 271 ("Because the government officials who *issued* the warrant here did not have probable cause to arrest Berg, the arrest violated the Fourth Amendment.")(emphasis added).

When the evidence is viewed in the light most favorable to Thompson, it establishes that his Fourth Amendment rights were violated. Assuming the declarations made by Lester in his affidavit to be true, a reasonable jury could conclude that the representations made by Wagner and Kopera to the magistrate concerning Lester's identification of Thompson as his assailant were false, and that Wagner and Kopera made such representations with reckless disregard for the truth. The members of the PSP who actually arrested Thompson were not aware of Burch's conversation with Wagner and Kopera, so they had no reason to arrest Thompson aside from the issuance of the warrant. *Whiteley*, 401 U.S. at 568 ("The arresting officer was not himself possessed of any factual data tending to corroborate the informer's tip that Daley and Whiteley committed the crime.")(footnote omitted). Although the affidavit of probable cause expressly referenced the comments of Willis and the Cheatham brothers (none of whom had identified Thompson as Lester's assailant), it made no mention of Burch. Document No. 34-2, p. 4; Aff. of Probable Cause. When Lester's alleged identification of Thompson

21

as the guilty party is excised from the affidavit of probable cause, there is nothing left to link Thompson to the crime. Since there is a genuine issue of material fact as to whether Wagner and Kopera provided the magistrate with false information about their discussion with Lester, there is also a genuine issue of material fact as to whether the arrest was in conformity with the Fourth Amendment. After all, the legality of the arrest turns precisely on the resolution of the disputed factual issue.

## C. QUALIFIED IMMUNITY

Although the statutory language of § 1983 speaks of no immunities, the Supreme Court has always assumed that Congress would have expressly made common law immunities inapplicable to § 1983 actions within the language of the statute if it had intended to do so. *Pierson v. Ray*, 386 U.S. 547, 554-555 (1967). For this reason, the "qualified immunity" that was available to state officials at common law is available to defendants such as Wagner and Kopera. *Kalina v. Fletcher*, 522 U.S. 118, 131-135 (1997)(Scalia, J., concurring)(discussing the common law origins of different forms of immunity available to officials sued under § 1983). As a general matter, government officials performing discretionary duties are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court recognizes that state officials can be on notice that their conduct violates clearly established federal law even under novel factual circumstances. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). This is because "general statements of law are not inherently incapable of giving fair and clear warning." *United States v. Lanier*, 520 U.S. 259, 271 (1997). In order for a federally protected right to be "clearly established" for purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable

22

official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Qualified immunity is not merely a defense to liability, but "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). For this reason, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)(per curiam).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court clarified the framework that must be employed by a court in determining whether a particular defendant is entitled to qualified immunity. Speaking through Justice Kennedy, the Supreme Court explained that a court evaluating a defendant's claim of qualified immunity must first decide whether the plaintiff can establish a violation of federal law in the first place. *Saucier*, 533 U.S. at 200-201. Since this issue is before the Court at the summary judgment stage, the relevant question is whether Thompson has presented sufficient evidence to enable a reasonable jury to determine that Wagner and Kopera violated his Fourth Amendment rights when they caused him to be arrested. *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996). The Court has already answered this question in the affirmative. The next question for consideration is whether the right asserted by Thompson was clearly established at the time of the alleged constitutional violation. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. The dispositive question is whether it would have been clear to reasonable officers in the position of Wagner and Kopera that their conduct was unlawful under the particular circumstances that they confronted. *Id.* at 202. The standard is objective, viewing the relevant circumstances from the perspective of an *objectively reasonable officer*. *Showers v. Spangler*, 182 F.3d 165, 171-172 (3d Cir. 1999). "As the qualified immunity defense has evolved, it provides

23

ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341.

In this case, the qualified immunity inquiry is relatively simple. The evidence of record, when viewed in the light most favorable to Thompson, establishes that Wagner and Kopera made false assertions in their affidavit of probable cause in order to have Thompson arrested. If Thompson had sued the officers who actually arrested him, they would have most likely been in a position to benefit from the defense of qualified immunity. *Pitchford v. Borough of Munhall*, 2007 WL 3494701, at *11-15, 2007 U.S. Dist. LEXIS 83932, at *41-57 (W.D.Pa. November 13, 2007). Nevertheless, Wagner and Kopera are the ones who prepared the affidavit of probable cause, which contained their own *false* factual assertions (considering the evidence in the light most favorable to Thompson). Therefore, they cannot rely on the assurances of others that probable cause existed to effectuate Thompson's arrest. *Groh v. Ramirez*, 540 U.S. 551, 564 (2004). The law concerning an officer's obligation to refrain from making false assertions in support of a criminal complaint was clearly established in 2003. *Wilson*, 212 F.3d at 786-789. A reasonable officer in the position of Wagner or Kopera would have known that an individual such as Thompson had a Fourth Amendment right not to be arrested on the basis of an arrest warrant secured as a result of deliberate factual misstatements.[11] The Court agrees with Thompson's

---

[11]Some courts have opined that evidence known to police officers executing a warrant, but unknown to the issuing magistrate, may be considered as a part of the inquiry into "objective reasonableness" when the question is whether illegally obtained evidence can nevertheless be admitted pursuant to the "good faith" exception to the exclusionary rule. *United States v. Guzman*, 507 F.3d 681, 685 (8th Cir. 2007); *United States v. Marion*, 238 F.3d 965, 969 (8th Cir. 2001). Nonetheless, such extraneous evidence (i.e., evidence such as Burch's statements to Wagner and Kopera indicating that Thompson had been Lester's assailant) cannot be relied upon to excuse a deliberate falsehood. *United States v. Leon*, 468 U.S. 897, 923, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)("Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth."). The Court is convinced that the same principle applies in the qualified immunity context. Even if it is assumed that Burch's statements to Wagner and Kopera provided them with

24

argument that false statements (particularly those made under oath) do not constitute the type of good faith conduct that the defense of qualified immunity is meant to protect. Accordingly, the Court will deny the Defendants' Motion for Summary Judgment with respect to the Fourth Amendment claims asserted against Wagner and Kopera. Wagner and Kopera, of course, remain free to argue at trial that the statements in their affidavit of probable cause were true.

## D.    MUNICIPAL LIABILITY UNDER § 1983

In his Complaint, Thompson names Johnstown as a defendant.[12] Document No. 1, ¶ 5. It is undisputed that Johnstown is a "person" within the meaning of § 1983. *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978). Unlike individual officials, a municipality such as Johnstown cannot avail itself of the defense of qualified immunity. *Owen v. City of Independence*, 445 U.S. 622, 638-657 (1980). Nevertheless, there is no *respondeat superior* liability under § 1983. *Monell*, 436 U.S. at 691. Thus, Thompson must do more than show that Johnstown employed tortfeasors in order to establish municipal liability in this case. *Id.* "Municipal liability only attaches when the 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" *Watson v. Abington Township*, 478 F.3d 144, 155 (3d Cir. 2007), quoting *Monell*, 436 U.S. at 694. A plaintiff can show that a policy existed

---

probable cause to have Thompson arrested, they cannot rely on qualified immunity to escape the consequences of their alleged deliberate (or reckless) falsehoods concerning their conversation with Lester at the Johnstown police station.

[12]The Complaint actually names the City of Johnstown Police Department as a defendant. Document No. 1, ¶ 5; Compl., ¶ 5. The Defendants contend that the police department is not a separate entity from the city itself, and that it is merely a part of the municipal government of the City of Johnstown. Document No. 31, p. 20, n. 3; Defs. Br., p. 20, n. 3. The Court need not dwell on this distinction, since Thompson cannot establish the existence of municipal liability in any event.

by establishing that a decisionmaker possessing the final authority to establish a municipal policy has issued an official proclamation, directive or edict. *Watson*, 478 F.3d at 155. The existence of a custom, on the other hand, can be established by a showing that a given course of conduct, though not specifically endorsed or authorized by law, has become so well-settled and permanent as to virtually constitute law. *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).

In *Board of County Commissioners v. Brown*, 520 U.S. 397 (1997), the Supreme Court explained that a rigorous standard of causation is applicable to claims involving municipal liability under § 1983. To hold Johnstown liable for the alleged actions of Wagner and Kopera, Thompson must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404 (emphasis in original). This means that he "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a *direct causal link* between the municipal action and the deprivation of federal rights." *Id.* (emphasis added).

Thompson does not explain how Johnstown, through a policy or custom, has contributed to the Fourth Amendment violations allegedly committed by Wagner and Kopera. Instead, he contends that Johnstown has structured its policing of the city by assigning officers to patrol six different zones, two of which are identified by reference to racial demographics. Document No. 34-3, ¶¶ 15-19. The Court acknowledges that, under the Equal Protection Clause of the Fourteenth Amendment, racial classifications trigger the most rigorous form of judicial scrutiny. *Miller v. Johnson*, 515 U.S. 900, 905, (1995). Nevertheless, the issue in this case is not whether Johnstown's policing practices were constitutionally permissible in a general sense, but rather whether the specific actions of Wagner and Kopera directly resulted from a policy or custom attributable to Johnstown. In order to prevent

Johnstown's potential liability to Thompson "from collapsing into *respondeat superior* liability," the Court must "carefully test the link" between the alleged inadequacies of Johnstown's actions and the particular constitutional violations allegedly committed by Wagner and Kopera. *Brown*, 520 U.S. at 410 (emphasis in original). The record is totally devoid of evidence that Johnstown fomented the Fourth Amendment violations alleged by Thompson in this case.[13] There is no causal relationship between Johnstown's alleged racial classifications (which would implicate the Equal Protection Clause) and the Fourth Amendment violations allegedly committed by Wagner and Kopera. Under these circumstances, Thompson cannot hold Johnstown liable under § 1983. Accordingly, the Defendants' Motion for Summary Judgment will be granted with respect to the § 1983 claims asserted against Johnstown.

## E.    DEFAMATION

Thompson asserts defamation claims arising under Pennsylvania law against Wagner, Kopera and Johnstown.[14] Document No. 1, ¶¶ 23-38; Compl., ¶¶ 23-38. Supplemental jurisdiction over these

---

[13]The Court notes that Thompson's Complaint says absolutely nothing about the alleged race-sensitive classifications discussed in Thompson's brief. Document No. 1; Compl.

[14]Count II of the Complaint could be read as asserting claims arising under the United States Constitution, claims arising under Pennsylvania law, or claims arising under both. Document No. 1, ¶¶ 23-38; Compl., ¶¶ 23-38. As noted earlier, the Complaint is somewhat vague as to the precise legal bases for each of the claims asserted therein. It is clear that Thompson is pursuing some claims arising under Pennsylvania law. *Id.*, ¶ 1; Compl., ¶ 1. On the other hand, Count II, like Counts I and III, references the Fourteenth Amendment (in addition to the inapplicable Fifth and Eighth Amendments). *Id.*, ¶¶ 6-50; Compl., ¶¶ 6-50. In their brief, the Defendants treat Count II as asserting only defamation claims arising under Pennsylvania law. Document No. 31, pp. 15-19; Defs. Br., pp. 15-19. In his responsive brief, Thompson does not quarrel with this narrow characterization of Count II. Document No. 34, pp. 4-5; Pl.'s Br., pp. 4-5. Therefore, the Court has no occasion to consider whether Thompson, on the basis of the present record, could sustain defamation claims arising under the Due Process Clause of the Fourteenth Amendment pursuant to *Wisconsin v. Constantineau*, 400 U.S. 433 (1971), and its progeny. The Court will not address this question, since neither party has seen fit to brief it. Nevertheless, it is worth noting that a state immunity statute cannot immunize an official from a cause of action arising under federal law. *Martinez v. California*, 444 U.S. 277, 284, n. 8 (1980). Consequently, the Court's discussion about Pennsylvania's Political Subdivision Tort Claims Act [42 Pa. Cons. Stat. § 8541 *et seq.*] is relevant only insofar as Count II is construed to assert

27

claims is pedicated on 28 U.S.C. § 1367(a). The Defendants argue that these claims are both

unsupported by the record and barred by Pennsylvania's Political Subdivision Tort Claims Act

("PSTCA") [42 Pa. Cons. Stat. § 8541 *et seq.*]. Document No. 31, pp. 15-19. The Court evaluates the

Defendants' arguments in light of its earlier determination that a reasonable jury could conclude, based

on Lester's affidavit, that Wagner and Kopera knowingly included false statements within their affidavit

of probable cause in order to have Thompson arrested.

Pennsylvania has enacted statutory provisions governing actions for defamation. The applicable

burdens of proof are codified at 42 Pa. Cons. Stat. § 8343, which provides:

**§ 8343. Burden of proof**
**(a) Burden of plaintiff.**–In an action for defamation, the plaintiff has the burden of
proving, when the issue is properly raised:

    (1) The defamatory character of the communication.

    (2) Its publication by the defendant.

    (3) Its application to the plaintiff.

    (4) The understanding by the recipient of its defamatory meaning.

    (5) The understanding by the recipient of it as intended to be applied to the
    plaintiff.

    (6) Special harm resulting to the plaintiff from its publication.

    (7) Abuse of a conditionally privileged occasion.

**(b) Burden of defendant.**–In an action for defamation, the defendant has the burden
of proving, when the issue is properly raised:

    (1) The truth of the defamatory communication.

    (2) The privileged character of the occasion on which it was published.

    (3) The character of the subject matter of defamatory comment as of public
    concern.

42 Pa. Cons. Stat. § 8343. For the reasons discussed earlier, there is a genuine issue of material fact

concerning "[t]he truth of the defamatory communication." 42 Pa. Cons. Stat. § 8343(b)(1). The parties

---

defamation claims arising under Pennsylvania law.

appear to dispute the "privileged" status of the affidavit of probable cause, which contained the relevant defamatory statements about Thompson. The relevant "defamatory communication" was the portion of the affidavit of probable cause indicating that Lester had identified Thompson as his assailant.[15] Document No. 34-2, p. 4; Aff. of Probable Cause.

"A conditional privilege arises when a recognized interest of the public is involved." *American Future Systems v. Better Business Bureau of Eastern Pennsylvania*, 872 A.2d 1202, 1210 (Pa.Super.Ct. 2005). "Communications which are made on a proper occasion, from a proper motive, in a proper manner, and which are based upon reasonable cause are privileged." *Moore v. Cobb-Nettleton*, 889 A.2d 1262, 1268 (Pa.Super.Ct. 2005). Though contradicted by Lester's affidavit, the testimony of Wagner and Kopera concerning Lester's identification of Thompson as the perpetrator of the crime, if believed by a jury, could establish the existence of a conditional privilege under § 8343(b)(2).[16] Once a communication is deemed to be conditionally privileged, the plaintiff must establish that the conditional privilege was abused by the defendant. *Miketic v. Baron*, 675 A.2d 324, 329 (Pa.Super.Ct. 1996). In *Beckman v. Dunn*, 419 A.2d 583 (Pa.Super.Ct. 1980), the Pennsylvania Superior Court declared:

> Abuse of a conditional privilege is indicated when the publication is actuated by malice

---

[15]"In Pennsylvania, a defamatory statement is one that tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Resnick v. Manfredy*, 52 F.Supp.2d 462, 470 (E.D.Pa. 1999)(internal quotation marks omitted). That standard is easily met where, as here, the defamatory statement implicates the plaintiff in criminal activity. Under Pennsylvania law, a statement indicating that the plaintiff has engaged in criminal activity constitutes slander *per se*, obviating the need for the plaintiff to prove "special harm" under § 8343(a)(6). *Klump v. Nazareth Area School District*, 425 F.Supp.2d 622, 638 (E.D.Pa. 2006).

[16]The Court makes this observation merely for analytical purposes. Thompson, of course, does not move for summary judgment. Therefore, the focus of the Court's analysis is on whether Thompson can meet his burden of proof under § 8343(a)(7), not on whether the Defendants can meet their burden of proof under § 8343(b)(2).

or negligence, is made for a purpose other than that for which the privilege is given, or to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege, or includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose.

*Beckman*, 419 A.2d at 588 (internal citations and footnote omitted). Thompson surmounts this hurdle by producing Lester's affidavit, which flatly contradicts the affidavit of probable cause as to whether Lester identified Thompson as his assailant. Document No. 34-2, pp. 4-6; Aff. of Probable Cause; Lester Aff., ¶¶ 6-7. Since a reasonable jury could conclude that Wagner and Kopera falsely implicated Thompson in criminal activity, there is a genuine issue of material fact as to whether they abused a conditional privilege. The conflict between the testimony of Wagner and Kopera and the declarations in Lester's affidavit also illustrates that there is a genuine issue of material fact as to "[t]he truth of the defamatory communication" under § 8343(b)(1).

The Court's inquiry does not end there. The Defendants argue that Thompson's claims are barred by the PSTCA. Section 8541 of the PSTCA provides that "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person," except as otherwise provided in the PSTCA.[17] 42 Pa. Cons. Stat. § 8541. Section 8545 provides that "[a]n employee of a local agency is liable for civil damages on account of any injury to a person or property caused by acts of the employee which are within the scope of his office or duties only to the same extent as his employing local agency and subject to the limitations imposed by [the PSTCA]." 42 Pa. Cons. Stat. § 8545. When an action is "brought against an employee of a local agency for damages on account of an injury to a person or property based upon

---

[17]The parties do not dispute that Johnstown is a "local agency" within the meaning of 42 PA. Cons. Stat. § 8501.

claims arising from, or reasonably related to, the office or the performance of the duties of the

employee," the PSTCA permits the employee to assert, in addition to common law defenses, "[t]he

defense that the conduct of the employee which gave rise to the claim was authorized or required by

law, or that he in good faith reasonably believed the conduct was authorized or required by law." 42

Pa. Cons. Stat. § 8546.

The provisions of the PSTCA most relevant to the Court's analysis in this case are §§ 8542(a)

and 8550. Section 8542(a) provides:

## § 8542. Exceptions to governmental immunity
**(a) Liability imposed.**–A local agency shall be liable for damages on account of an
injury to a person or property within the limits set forth in this subchapter if both of the
following conditions are satisfied and the injury occurs as a result of one of the acts set
forth in subsection (b):

(1) The damages would be recoverable under common law or a statute creating
a cause of action if the injury were caused by a person not having available a
defense under section 8541 (relating to governmental immunity generally) or
section 8546 (relating to defense of official immunity); and

(2) The injury was caused by the negligent acts of the local agency or an
employee thereof acting within the scope of his office or duties with respect to
one of the categories listed in subsection (b). As used in this paragraph,
"negligent acts" shall not include acts or conduct which constitutes a crime,
actual fraud, actual malice or willful misconduct.

42 Pa. Cons. Stat. § 8542(a). Section 8542(b) enumerates eight general categories of "negligent acts"

for which a local agency can be held liable. 42 Pa. Cons. Stat. § 8542(b). The categories are entitled:

(1) Vehicle liability; (2) Care, custody or control of personal property; (3) Real property; (4) Trees,

traffic controls and street lighting; (5) Utility service facilities; (6) Streets; (7) Sidewalks; and (8) Care,

custody or control of animals. *Id.* These categories of negligence are completely inapplicable to the

present case, and the Court does not understand Thompson to argue otherwise.

31

The other provision of the PSTCA relevant to the Court's analysis is § 8550, which provides:

**§ 8550. Willful misconduct**
In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of sections 8545 (relating to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply.

42 Pa. Cons. Stat. § 8550.[18] The evidence of record, when viewed in the light most favorable to Thompson, could establish that Wagner and Kopera maliciously provided false information to the issuing magistrate when they stated, in their affidavit of probable cause, that Lester had identified Thompson as the perpetrator of the crime. The affidavit of probable cause, of course, set in motion a series of events which culminated in Thompson's arrest. Thus, the statutory requirement of causation is clearly met. The criminal complaint which Wagner and Kopera signed on September 25, 2003, specifically noted that Pennsylvania law criminalizes the giving of false information to authorities. Document No. 34-2, p. 3; 18 Pa. Cons. Stat. § 4904. Moreover, the pursuit of unfounded criminal charges against an individual has long been recognized as "willful misconduct" within the meaning of § 8550. *Overstreet v. Borough of Yeadon*, 475 A.2d 803 (Pa.Super.Ct. 1984). Consequently, the Court cannot conclude as a matter of law that Wagner and Kopera are entitled to immunity under the PSTCA. It is true that they will be entitled to statutory immunity if it is determined that they did not make false statements in their affidavit of probable cause. *DeVatt v. Lohenitz*, 338 F.Supp.2d 588, 599 (E.D.Pa. 2004). That issue, however, must be resolved by the trier of fact.

---

[18]Sections 8548 and 8549 of the PSTCA are not discussed in this opinion because they are not relevant to the Court's analysis.

The plain language of § 8550 provides that the provisions of §§ 8545 and 8546 "shall not apply" where "it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct." 42 Pa. Cons. Stat. § 8550. Section 8550 does not contain a similar reference to § 8541. Therefore, the immunity enjoyed by Johnstown under the PSTCA is not impacted by § 8550. *Overstreet*, 475 A.2d at 803-804. In order to hold Johnstown liable for the alleged defamatory statements made by Wagner and Kopera, Thompson must overcome Johnstown's immunity pursuant to § 8542. As noted earlier, the defamation alleged by Thompson does not fall within any of the categories of "negligent acts" enumerated in § 8542(b). For this reason, Thompson's claims against Johnstown are barred by § 8541. *Wakshul v. City of Philadelphia*, 998 F.Supp. 585, 588 (E.D.Pa. 1998). Moreover, § 8542(a)(2) specifically provides that the term "negligent acts" does not include "conduct which constitutes a crime, actual fraud, actual malice or willful misconduct." 42 Pa. Cons. Stat. § 8542(a)(2). In order to overcome the statutory immunity enjoyed by Wagner and Kopera under § 8545, Thompson must establish that their actions amounted to "a crime, actual fraud, actual malice or willful misconduct." 42 PA. CONS. STAT. § 8550. The PSTCA distinguishes sharply between the employees of a local agency and the local agency itself with respect to liability for malicious or willful misconduct. The same *maliciousness* or *willfulness* that makes an employee liable on a claim simultaneously places that claim outside of the category of claims for which a local agency can be held liable. *Cooper v. City of Chester*, 810 F.Supp. 618, 626 (E.D.Pa. 1992). Consequently, Thompson could not recover damages from *both* Johnstown *and* Johnstown's employees even if the defamation at issue in this case had been within a category of acts enumerated in § 8542(b).

33

Accordingly, the Defendants' Motion for Summary Judgment will be denied with respect to the defamation claims against Wagner and Kopera and granted with respect to the defamation claims against Johnstown. In order to overcome the immunity enjoyed by Wagner and Kopera under the PSTCA, Thompson will have to establish that their actions amounted to "a crime, actual fraud, actual malice or willful misconduct" within the meaning of § 8550.

## VI.    CONCLUSION

Because a genuine issue of material fact exists as to whether Wagner and Kopera knowingly (or recklessly) made false statements about Thompson in their affidavit of probable cause, the Defendants' Motion for Summary Judgment will be denied with respect to the § 1983 claims against Wagner and Kopera. The Motion for Summary Judgment will also be denied with respect to the defamation claims against Wagner and Kopera, since there is a genuine issue of material fact as to whether the statements at issue constituted "a crime, actual fraud, actual malice or willful misconduct" under § 8550. The race-conscious policing structure allegedly implemented by Johnstown had absolutely nothing to do with the Fourth Amendment violations alleged by Thompson. For this reason, the Motion for Summary Judgment will be granted with respect to the § 1983 claims against Johnstown. Furthermore, the Motion for Summary Judgment will also be granted with respect to the defamation claims against Johnstown, since the PSTCA immunizes Johnstown from those claims. Summary judgment will be granted in favor of Johnstown, but not in favor of Wagner and Kopera, with respect to the claims arising under the Fourth Amendment and Pennsylvania law. Since the Fifth and Eighth Amendments are completely inapplicable to the facts alleged by Thompson, summary judgment will be granted in favor of all of the Defendants with respect to any claims asserted by Thompson under the Fifth and Eighth

34

Amendments. An appropriate order follows.

**AND NOW**, this 29th day of September, 2008, this matter coming before the Court on the Motion for Summary Judgment filed by the Defendants pursuant to Federal Rule of Civil Procedure 56 (Document No. 30), IT IS HEREBY ORDERED that the Motion for Summary Judgment is **GRANTED** with respect to the Fourth Amendment and defamation claims against Johnstown and **DENIED** with respect to the Fourth Amendment and defamation claims against Wagner and Kopera. IT IS FURTHER ORDERED that the Motion for Summary Judgment is **GRANTED** with respect to any claims arising under the Fifth and Eighth Amendments.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

35